FILED by ___**JA**___ D.C.

**Apr 24, 2020**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
# 20-60089-CR-ALTMAN/HUNT
Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)
18 U.S.C. § 982(a)(7)
18 U.S.C. § 981(a)(1)(C)

**UNITED STATES OF AMERICA**

**vs.**

**MATTHEW SMITH and**
**ALISA CATOGGIO,**

       **Defendants.**
_____/

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times material to this Information:

1.     Tricare was a health care insurance program of the United States Department of Defense. Tricare provided civilian health benefits for military personnel, military retirees, and military dependents worldwide. The Tricare program provided medical coverage for uniformed service members including those who were active duty and reservists. This program also covered survivors, former spouses, Medal of Honor recipients and their families, and others registered in the Defense Enrollment Eligibility Reporting System (DEERS).

2.     Tricare contracted with Express Scripts, Incorporated (ESI) to administer the prescription drug plan of the Tricare program, including the processing and payment of claims.

3.      The Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) was a health care insurance program of the United States Department of Veterans Affairs. CHAMPVA provided health care benefits for a child or spouse, or surviving child or spouse, of a veteran who was rated as "permanent and total" disabled from a service-connected disability or who had died with such a disability, provided the beneficiary was not otherwise qualified for benefits from Tricare.

4.      CHAMPVA contracted with OptumRx to administer the prescription drug plan of the CHAMPVA program, including the processing and payment of claims.

5.      Tricare and CHAMPVA were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined in Title 42, United States Code, Section 1320a-7b(f).

6.      In order to pay a claim, Tricare and CHAMPVA required that the item or service being billed must be medically necessary, properly prescribed by a licensed physician and actually provided to the beneficiary. As an additional prerequisite to paying a claim, Tricare and CHAMPVA required healthcare providers to collect co-payments from the beneficiary unless specifically excepted by law or regulation ancillary to the provision of items or services. As set forth in Tricare's policy manual, requiring beneficiaries to pay for part of the services they received discouraged patients from accepting services they did not need. Moreover, it was unlawful to routinely waive co-payments under any federal health insurance program, including Tricare and CHAMPVA. The U.S. Department of Health and Human Services had concluded that reducing co-payments for beneficiaries of government healthcare programs, absent a showing of financial hardship, violated the federal anti-kickback statute. Additionally, a co-payment waiver based on a failure to collect was prohibited if it was not preceded by a good faith collection effort.

2

7.     Pharmacy compounding was a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combined, mixed, or altered ingredients of a drug to create a medication tailored to the particular needs of an individual patient.

8.     Tricare strictly limited the use of telemedicine as a method of treating Tricare patients. Tricare did not consider telemedicine a substitute for in-person health care except in very limited situations. An example of the proper use of a telemedicine "visit" was when the patient could not meet a medical professional in person because they were located in a remote location. Another proper use of a telemedicine "visit" was when there was a particular need for continuity of care with a specific medical professional. In addition, the originating site where the beneficiary was located for the telemedicine "visit" was required to be a location where an authorized Tricare provider normally provided medical services to Tricare beneficiaries. A patient's home was never a proper originating site for a proper telemedicine "visit." A proper telemedicine "visit" was required to utilize some form of video technology in which the patient and the medical professional could see and visually interact with each other.

## The Defendants, Related Companies and Individuals

9.     Diabetic Care Rx, LLC, a/k/a DCRX Infusion, a/k/a Patient First Renal Solutions, d/b/a Patient Care America (PCA) was a corporation organized under the laws of the State of Florida, with its principal place of business located in Broward County, Florida, that purportedly prepared and dispensed prescription compounded drugs to Tricare and CHAMPVA beneficiaries.

10.     Company 1 was a business that purportedly provided marketing services to PCA.

11.     Charity 1 was an entity that utilized the same physical address and bank accounts as Company 1, and purported to be a non-profit charity.

12.    Company 2 was a business that purportedly provided marketing services to PCA.

13.    Company 3 was a business that purportedly provided marketing services to PCA.

14.    Charity 2 was an entity that purported to be a non-profit charity.

15.    MGTen was a business that purported to provide marketing services to PCA.

16.    Defendant **MATTHEW SMITH**, a resident of Florida, was a licensed pharmacist and the vice-president of PCA in charge of non-sterile compounding operations.

17.    **ALISA CATAGGIO**, a resident of Florida, was a licensed pharmacy technician, an employee at PCA, and the executive assistant to **MATTHEW SMITH**.

18.    Individual 1, a resident of California, operated Company 1 and Charity 1.

19.    Individual 2, a resident of Georgia, was the owner and operator of Company 2 and Company 3.

20.    Monty Grow, a resident of Florida, was the owner and operator of MGTen.

21.    Dr. Paul Bolger, a resident of Iowa, was a medical doctor.

22.    Kirtis Green was a resident of North Carolina.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.    The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2.    From in or around July 2014, through in or around at least July 2015, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**MATTHEW SMITH and
ALISA CATOGGIO,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and with others, known and unknown

4

to the United States Attorney, including Individual 1, Individual 2, Monty Grow, Dr. Paul Bolger, Kirtis Green and others, to commit offenses against the United States, that is:

a.      to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Tricare and CHAMPVA, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks for the referral of Tricare and CHAMPVA beneficiaries and their accompanying prescriptions to PCA without regard to any medical necessity for, or therapeutic value of, the prescribed medication; (b) submitting and causing the submission of false and fraudulent claims to Tricare and CHAMPVA; (c) concealing the submission of false and fraudulent claims to Tricare and CHAMPVA; (d)

concealing the receipt and transfer of fraud proceeds; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4. **MATTHEW SMITH, ALISA CATOGGIO,** Individual 1, Individual 2 and others designed specific formulas for compounded drugs, which involved manipulating active and non-active ingredients used in making compounded drugs, for the purpose of maximizing reimbursements from Tricare and CHAMPVA, regardless of the medical and therapeutic value of the formulas or ingredients used.

5. **MATTHEW SMITH,** Individual 1, Individual 2 and Monty Grow agreed that PCA would pay Individual 1, Individual 2 and Grow fifty to sixty-five percent of the profits collected by PCA for Tricare and CHAMPVA beneficiaries referred by Individual 1, Individual 2 and Grow to PCA.

6. Individual 1 used call centers to solicit Tricare and CHAMPVA beneficiaries to order compounded drugs, falsely describing the drugs as free or no cost, and as FDA regulated.

7. Co-conspirators induced Tricare and CHAMPVA beneficiaries to order compound medications by paying the beneficiaries to participate in phony drug studies or surveys.

8. Individual 1 and Individual 2 offered and paid kickbacks and bribes to prescribers, including Dr. Paul Bolger and others, to approve preprinted prescriptions for expensive compounded drugs that Tricare and CHAMPVA beneficiaries did not need, and without a legitimate prescriber-patient relationship.

9.     **MATTHEW SMITH, ALISA CATOGGIO,** Individual 1, Individual 2 and others agreed to waive and failed to collect required co-payments from Tricare and CHAMPVA beneficiaries, without regard to the beneficiaries' ability to pay, for purposes of inducing the beneficiaries to order compounded drugs they did not need.

10.     Individual 1 created and operated Charity 1, a fictitious entity which represented that it charitably funded co-payments for indigent insurance beneficiaries, for the purposes of inducing Tricare and CHAMPVA beneficiaries to order drugs and concealing PCA's lack of legitimate co-payment collection. Individual 1 and **MATTHEW SMITH** agreed to each pay 50% of the Tricare and CHAMPVA beneficiaries' co-payments through Charity 1 to conceal the true source of the payments.

11.     **MATTHEW SMITH, ALISA CATOGGIO** and Individual 2 agreed that all Company 2 patients would be pre-approved for Charity 2 to pay their co-payments, without regard to the patients' ability to pay. Co-conspirators working with Individual 2 funded Charity 2 so that it could conceal the true source of the payments.

12.     **MATTHEW SMITH, ALISA CATOGGIO,** Individual 1, Individual 2 and others submitted and caused PCA to submit false and fraudulent claims, via interstate wire communication, to Tricare and CHAMPVA for unnecessary compounded drugs provided as a result of kickbacks and other incentives, designed and formulated for maximum reimbursement without regard to medical necessity or therapeutic value, and not properly prescribed by a licensed medical professional with a legitimate physician-patient relationship.

13.     As the result of these false and fraudulent claims, Tricare and CHAMPVA made payments, via interstate wire communication, to PCA in the approximate amount of $87 million. In turn, PCA, paid, often via interstate wire communication, approximately $9 million to

Individual 1 through Company 1, approximately $7.6 million to Individual 2 through Company 2 and Company 3, and approximately $18 million to Monty Grow through MGTen.

14.     **MATTHEW SMITH, ALISA CATOGGIO,** Individual 1, Individual 2 and others used the fraud proceeds to benefit themselves and others, and to further the fraud scheme.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.     The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around July 2014, through in or around at least June 2015, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**MATTHEW SMITH and
ALISA CATOGGIO,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, and with others known and unknown to the United States Attorney, including Individual 1, Individual 2, Monty Grow, Dr. Paul Bolger, Kirtis Green and others, to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Defense and the Department of Veterans Affairs in their administration and oversight of the Tricare and CHAMPVA programs, in violation of Title 18, United States Code, Section 371, and to commit offenses against the United States, that is:

a.     to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an

8

individual to a person for the furnishing and arranging for furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Tricare and CHAMPVA; and

     b.    to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Tricare and CHAMPVA.

## Purpose of the Conspiracy

     3.    It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (a) offering and paying kickbacks and bribes in return for referring Tricare and CHAMPVA beneficiaries to order and receive compounded drugs from PCA; (b) offering and paying kickbacks and bribes in the form of illicit co-payment waivers, phony patient surveys, and other benefits, as a way to induce to Tricare and CHAMPVA beneficiaries to order compounded drugs from PCA; (c) offering and paying kickbacks and bribes to physicians and nurse practitioners in exchange for ordering and prescribing compounded drugs from PCA for Tricare and CHAMPVA beneficiaries; (d) submitting and causing the submission of false and fraudulent claims to Tricare and CHAMPVA for compounded drugs for Tricare and CHAMPVA beneficiaries; and (e) diverting fraud proceeds, kickbacks and bribes for their personal use, the use and benefit of others, and to further the scheme.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.    **MATTHEW SMITH**, Individual 1, Individual 2, Monty Grow and others agreed that PCA would pay fifty percent to sixty-five percent of the profits collected by PCA for Tricare and CHAMPVA beneficiaries referred by Individual 1, Individual 2, Grow and others to PCA.

5.    **ALISA CATOGGIO** tracked kickback payments due from PCA to Individual 1, Individual 2, Monty Grow and others for Tricare and CHAMPVA beneficiary referrals.

6.    Individual 1 and Individual 2 offered and paid kickbacks to physicians and nurse practitioners, including Dr. Paul Bolger, to approve preprinted prescriptions for expensive compounded drugs for Tricare and CHAMPVA beneficiaries billed by PCA.

7.    Individual 2 offered to pay and paid Kirtis Green and others for recruiting and referring Tricare and CHAMPVA beneficiaries and their prescriptions for compounded drugs to Individual 2, who in turn referred the scripts to PCA in exchange for kickbacks.

8.    Individual 1 created and operated Charity 1, a fictitious entity which represented that it charitably funded co-payments for indigent insurance beneficiaries, for the purposes of inducing Tricare and CHAMPVA beneficiaries to order compounded drugs and concealing PCA's lack of legitimate co-payment collection. Individual 1 and **MATTHEW SMITH** agreed to each pay 50% of the Tricare and CHAMPVA beneficiaries' co-payments through Charity 1 to conceal the true source of the payments.

9.    **MATTHEW SMITH, ALISA CATOGGIO** and Individual 2 agreed that all Company 2 Tricare and CHAMPVA patients would be pre-approved for Charity 2 to pay their co-payments, without regard to the patients' ability to pay, for purposes of inducing Tricare and

CHAMPVA beneficiaries to order compound drugs and to conceal PCA's lack of legitimate co-payment collection.

10.    **MATTHEW SMITH, ALISA CATTOGIO,** Individual 1, Individual 2 and others submitted and caused PCA to submit false and fraudulent claims to Tricare and CHAMPVA for unnecessary compounded drugs provided as a result of kickbacks and other incentives, designed and formulated for maximum reimbursement by Tricare and CHAMPVA without regard to medical necessity or therapeutic value, and not properly prescribed by a licensed medical professional with a legitimate physician-patient relationship.

11.    As the result of these claims, Tricare and CHAMPVA made payments to PCA in the approximate amount of $87 million. In turn, PCA paid approximately $9 million in kickbacks to Individual 1 through Company 1, $7.6 million to Individual 2 through Company 2 and Company 3, and $18 million to Monty Grow through MGTen.

12.    **MATTHEW SMITH, ALISA CATOGGIO,** Individual 1, Individual 2 and others used the proceeds of the conspiracy to benefit themselves and others, and to further the scheme.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

1.    On or about July 17, 2014, Individual 1 e-mailed **MATTHEW SMITH** at PCA in Broward County discussing an illicit co-payment scheme stating that, "[s]ometimes, as you know, that $40 copay stops people from ordering a $6000 medication, of which $5960 is free ... lol."

2.    On or about June 17, 2014, **MATTHEW SMITH** responded to Individual 1's email stating, "Yes, I agree. I have been experiencing many 'no-go's' secondary to not wanting to

pay a $20-$75 copay."

3.    On or about August 4, 2014, Individual 1 e-mailed **MATTHEW SMITH** to confirm with **SMITH** that Company 1 was willing to fund co-payments for all patients referred by Company 1 to PCA, because Company 1 "will not lose a patient over a copay."

4.    On or about August 21, 2014, Individual 1 e-mailed **MATTHEW SMITH** explaining "[Charity 1] will be sending 100% of the payment to PCA that is due for each client on behalf of each client so the pharmacy can ACT complaint [sic] – but since they only receive 50% of the profit [on the prescription], they only will pay 50% of the expense – the pharmacy covers the other 50% from their profit (thus equaling 100%) - this keeps things even and fair."

5.    On or about August 21, 2014, **MATTHEW SMITH** emailed Individual 1 clarifying: "[Individual 1 ]—so we send [Charity 1] let's [say] $17.50 of a $35.00 copay and they then in return send us $35.00 correct? hmmmm, if we are audited I'm trying to make sense of 'why' we would be sending 50% of the copay to an outside entity."

6.    On or about August 21, 2014, Individual 1 emailed **MATTHEW SMITH,** responding: "I would put [Charity 1] down as a MARKETING COMPANY same way you would list [Company 1]. There is no way to connect what you are paying Charity 1 to a certain % of a certain amount of patients copays."

7.    On or about September 13, 2014, Individual 2 sent an email to Individual 1 and Monty Grow, attaching a contract between Company 2 and Company 1, and stating" "Here you go [Individual 1], Thank You, Please send me the info for the pharmacy so I can set up their profile on our portal for assignment of the rx's."

8.    On or about September 13, 2014, co-conspirator Monty Grow sent an email to Individual 1 attaching a contract between MGTen and Company 1.

9.     On or about September 26, 2014, **MATTHEW SMITH** emailed Individual 1: "[Individual 1]—we need for you to figure out a way to delete any notation of a fax number prior to submission for us to fill prescriptions. There has been some documented history of payors recouping monies secondary to tracking fax number history outside the physician office. We need to stay under the radar and certainly away from patient brokering. Let me know how and when this can be completed."

10.     On or about October 8, 2014, **ALISA CATOGGIO** sent **MATTHEW SMITH** an email concerning prescriptions submitted by Individual 2 noting that "THE TRAIL OF NUMBERS ARE ON THESE."

11.     On or about October 8, 2014, **MATTHEW SMITH** responded to **ALISA CATOGGIO**'s email, instructing her to "Print, white out and scan in PK. I have just sent Erik an email."

12.     On or about October 21, 2014, Individual 2 sent **MATTHEW SMITH** and **ALISA CATOGGIO** an email with a subject line "Tricare issues," in which he explained how to obtain an "override" when Tricare denied a claim. In the email, Individual 2 described, among other things, "the way it usually works is all you need is the DOD number, which I know they have sent in. Secondly, most of the time they will tell you that it has a max of like 1,000 or 2,000, but when you call the Tricare Prior Auth phone number they will give you an amazing paying override."

13.     On or about December 30, 2014, Individual 2 emailed **ALISA CATOGGIO** asking: "Why is this formula coming back at $3,700 for Tricare? This is a $15,000 formula. I am sure they did not call in for the Override."

14.     On or about January 20, 2015, Individual 1 e-mailed **ALISA CATOGGIO** explaining "We had a note that Patient : [R.M.] complain [sic] about the $17 co-pay per med. We

will have [Charity 1] gladly pay the amounts for All tri-care patients. I want to make sure that is clear and that [Charity 1] covering co-pay is part of the process if they complain or cant make the payment due poverty [sic] . . . Thanks team. Could you imagine losing a $10k patient for 3 copays of $17? I can't :(".

15.     On or about January 20, 2015, **ALISA CATOGGIO** responded in an e-mail to Individual 1, stating "Cynthia already spoke to the patient [R.M.] and made her aware that she will not have a copay. Cynthia already placed the patient on Auto-refill too."

16.     On or about January 20, 2015, Individual 1 responded in an e-mail to **ALISA CATOGGIO**, stating "GREAT!!! AUTO FILL. The best words invented :)".

17.     On or about January 21, 2015, **MATTHEW SMITH** emailed co-conspirator Monty Grow stating: "Who's fax # is this ? We cannot show outside fax #'s on these Rx's. There is a HIPPA concern around unsecured pathways & patients brokering concerns when speaking around scripts not coming directly from the MD."

18.     On or about February 23, 2015, Individual 2 emailed a prescription for a Tricare beneficiary to **MATTHEW SMITH, ALISA CATOGGIO** and other PCA employees, with the accompanying message: "Please Confirm adjudication amount before processing. We never heard back regarding this new formula." When a PCA employee reported the adjudication amount and requested to speak to the prescriber, Individual 2 responded: "You guys are way off base with the adjudications. This cream clears for $14k The clinician that prescribes this way I cannot divulge, long story. But I have no problem have ing [sic] it switched to the wrist? The issue is the reimbursement. Please advise."

19.     On or about February 27, 2015, **ALISA CATOGGIO** sent an email to **MATTHEW SMITH** with the subject line "[Company 2] Commission @ 65%" and an attached

spreadsheet.

20.     On or about March 4, 2015, Dr. Paul Bolger sent Individual 1 a message via Skype, asking "On the patients that cj sent, do you want me to call them ?  They all say that they are waiting for calls…:(".

21.     On or about March 4, 2015, Individual 1 responded to Dr. Paul Bolger via Skype, stating "you can call and leave a message . . . if they don't answer, then proceed to do the script . . . if they call back you can do a quick summary of what you prescribed them . . . normally its 1 or 2 out of 10 that 'require' consults' . . . we only do this when a patient asks and only so they don't tell pharmacy, "WELL I NEVER SPOKE TO A DOCTOR" – which the pharmacy does not like hearing".

22.     On or about March 4, 2015, Individual 1 sent Dr. Paul Bolger a message via Skype, indicating that the "default" arrangement is not to call the patient and to call the patient "ONLY IF IT HAS HUGE RED LETTERS."

23.     On or about March 6, 2016, Individual 2 wrote a check to **ALISA CATOGGIO** for $2,500.

24.     On or about March 7, 2015, Individual 1 sent Dr. Paul Bolger a message via Skype, instructing Dr. Paul Bolger to give each patient six refills on each prescription.

25.     On or about March 20, 2015, Dr. Paul Bolger cashed an $1800 kickback payment from Company 1.

26.     On or about April 6, 2015, Individual 1 sent, and caused to be sent, approximately 37 cashier's checks to PCA in Broward County to cover the co-payments for 37 Tricare beneficiaries referred to PCA by Company 1.

27.     On or about April 7, 2015, Individual 2 transferred $3,900 to a doctor as a kickback

for writing prescriptions.

28.     On or about April 14, 2015, Dr. Paul Bolger cashed a $5,250 kickback payment from Company 1.

29.     On or about April 15, 2015, Individual 2 transferred approximately $480,051 to co-conspirator Kirtis Green as kickbacks for the referral of Tricare beneficiaries to PCA.

30.     On or about April 16, 2015, **ALISA CATOGGIO** sent **MATTHEW SMITH** an email with the subject line "[Company 2] 'TRICARE' Active Duty patients" stating "every one of their patients is eligible for Copay Assistance and is to be offered immediately....Do not hold back the script pending approval. All these patients will be approved."

31.     On or about April 24, 2015, Individual 2 transferred $3,200 to a doctor as a kickback for writing prescriptions.

32.     On or about May 1, 2015, Individual 1 made a $5,000 Paypal transfer to **ALISA CATOGGIO**.

33.     On or about May 5, 2015, **ALISA CATOGGIO** emailed a PCA employee in Broward County (copying **MATTHEW SMITH**) regarding a Company 1 patient who was told that "the medication was free and not going to be charged on her insurance," and instructed the PCA employee to "[p]lease contact this patient back and make them aware that it is no charge to them. Company 1 has a copay program, Charity 1."

34.     On or about May 12, 2015, **MATTHEW SMITH** emailed **ALISA CATOGGIO** instructing her to "Please respond to Ralph & I don't want any reversals due to this invalid sig stuff."

35.     On or about May 21, 2015, a co-conspirator transferred $5,000 to Charity 2 to fund co-payments for PCA's Tricare beneficiaries.

36.     On or about June 11, 2015, Individual 1 sent, and caused to be sent, approximately 150 cashier's checks to PCA in Broward County to cover co-payments for approximately 150 Tricare beneficiaries referred to PCA by Company 1.

37.     On or about June 15, 2015, Individual 2 transferred $2,950 to a doctor as a kickback for writing prescriptions.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 3-7
### Payment of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(2)(A))

1.     The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates enumerated below, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**MATTHEW SMITH and
ALISA CATOGGIO,**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and by wire transfer, as set forth below, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, this is, Tricare and CHAMPVA:

| Count | Approximate Date of Kickback Payment | Approximate Amount of Kickback Payment |
|---|---|---|
| 3 | 04/24/2015 | $963,117 |
| 4 | 04/29/2015 | $1,809,065 |
| 5 | 05/18/2015 | $2,208,917 |

| Count | Approximate Date of Kickback Payment | Approximate Amount of Kickback Payment |
|---|---|---|
| 6 | 06/15/2015 | $16,294 |
| 7 | 06/29/2015 | $249,480 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

## FORFEITURE
### (18 U.S.C. §§ 982(a)(7) and 981(a)(1)(C))

1.    The allegations contained in this Information are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants, **MATTHEW SMITH** and **ALISA CATOGGIO**, have an interest.

2.    Upon conviction of any violation of Title 18, United States Code, Section 1349, as alleged in Count 1 of the Information, the defendant so convicted shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7).

3.    Upon conviction of a violation of Title 18, United States Code, Section 371, as alleged in Count 2 of this Information, the defendant so convicted shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Section 982(a)(7).

4.    Upon conviction of a violation of Title 42, United States Code, Section 1320a-7(b), as alleged in Counts 3 through 7 of this Information, the defendant so convicted shall forfeit to the

United States, any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Section 982(a)(7).

5.   The property subject to forfeiture includes, but is not limited to, approximately $87,000,000.00 in United States currency, which is a sum of money equal in value to the gross proceeds traceable to the commission of the violation alleged in this Information, which the United States will seek as a forfeiture money judgment as part of each defendant's sentence.

6.   If any of the property described above, as a result of any act or omission of the defendant:

    a.   cannot be located upon the exercise of due diligence;
    b.   has been transferred or sold to, or deposited with, a third party;
    c.   has been placed beyond the jurisdiction of the court;
    d.   has been substantially diminished in value; or
    e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code, Section 982(b).

ARIANNA FAJARDO ORSHAN
UNITED STATES ATTORNEY

JON M. JUENGER
ASSISTANT UNITED STATES ATTORNEY

DAVID S. TURKEN
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

**Matthew Smith, et al.**

—————————————————
Defendants.

CASE NO._____   _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

Court Division: (Select One)

| | | | |
|---|---|---|---|
| | Miami | | Key West |
| ✓ | FTL | | WPB | FTP |

New defendant(s)          Yes _____   No _____
Number of new defendants  _____
Total number of counts    _____

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:    (Yes or No)    No
    List language and/or dialect    ___ _____

4.  This case will take _10_ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)

    | | | | | | |
    |---|---|---|---|---|---|
    | I | 0 to 5 days | | Petty | | |
    | II | 6 to 10 days | ✓ | Minor | | |
    | III | 11 to 20 days | | Misdem. | | |
    | IV | 21 to 60 days | | Felony | ✓ | |
    | V | 61 days and over | | | | |

6.  Has this case previously been filed in this District Court?    (Yes or No)    No __ _
    If yes: Judge _____    Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?    (Yes or No)    No _____
    If yes: Magistrate Case No. _____
    Related miscellaneous numbers: _____
    Defendant(s) in federal custody as of _____
    Defendant(s) in state custody as of _____
    Rule 20 from the District of _____

    Is this a potential death penalty case? (Yes or No)    No __

7.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?    Yes _____    No ✓

8.  Does this case originate from a matter pending in the Northern Region U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?    Yes _____    No ✓

_____
JON M. JUENGER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 56108

REV 8/13/2018

*Penalty Sheet(s) attached

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: MATTHEW SMITH

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**:            Twenty (20) years' imprisonment

**Defendant's Name**: MATTHEW SMITH

**Case No**:

Count #: 2

Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**:            Five (5) years' imprisonment

**Defendant's Name**: MATTHEW SMITH

**Case No**:

Counts #: 3-7

Payment of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)

**\* Max. Penalty**:            Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: ALISA CATOGGIO

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**:            Twenty (20) years' imprisonment

**Defendant's Name**: ALISA CATOGGIO

**Case No**:

Count #: 2

Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**:            Five (5) years' imprisonment

**Defendant's Name**: ALISA CATOGGIO

**Case No**:

Counts #: 3-7

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\* Max. Penalty**:            Ten (10) years' imprisonment as to all counts

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| MATTHEW SMITH, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year.  I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

*Printed name of defendant's attorney*

_____
*Judge's signature*

*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| ALISA CATOGGIO, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*